

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

ENTERED
03/11/2010

| | | |
|---|---|---|
| IN RE: | § | |
| JAVIER ESTRADA, INC. | § | CASE NO: 09-50324 |
| Debtor(s) | § | |
| | § | CHAPTER 7 |

## MEMORANDUM FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DISGORGEMENT OF FEES

After examination of fees paid to Mr. Edward Fahey in connection with representation of the Debtor pre-petition in this bankruptcy case, the Court concludes that the services rendered by Mr. Fahey had no value. Therefore, the Court (by separate written order issued this date) will order disgorgement to the chapter 7 trustee of the entire amount of fees that Mr. Fahey received.

### I.    FACTS

Javier Estrada, Inc. ("Debtor") is an ambulance service previously operating under the name "A Ambulance Service." Mr. Javier Estrada is the owner and controlling person. Mr. Estrada has operated an ambulance service for 23 years. He failed to pay over to the Internal Revenue Service over one-half million dollars of employment and withholding taxes and the IRS commenced collection efforts, levying on his accounts. In addition, a check from the City of Rio Bravo (a former client of Debtor) for $365,000 was returned NSF. In the first few months of 2009, Mr. Estrada recognized that he had serious financial issues. He thought that the IRS was the focus for resolution of his problems.

A.    The Case--Chronologically

1.    Initial Inquiries

About March, 2009, Mr. Estrada contacted an attorney, Mr. Castillo. Although Mr. Estrada was focused on his problem with the IRS, Mr. Castillo suggested that Mr. Estrada should consider filing a bankruptcy case. Mr. Castillo contacted Pedro Lopez, a non-lawyer who works as a freelance, contract bankruptcy paralegal for a number of attorneys in Laredo. Mr. Castillo arranged a meeting that included Mr. Castillo, Mr. Estrada, and Mr. Lopez.

2.    Mr. Estrada Thought that Mr. Lopez was His Attorney

Mr. Estrada testified that he had previously become acquainted with Mr. Lopez when Mr. Estrada worked for the City of Rio Bravo. Mr. Estrada thought that Mr. Lopez was one of Rio Bravo's attorneys.

Mr. Estrada testified that at the first meeting in Mr. Castillo's offices (and for a couple of weeks thereafter) Mr. Estrada thought that Mr. Lopez was practicing law and that Mr. Lopez was

his attorney. Mr. Estrada testified that during the meeting in Mr. Castillo's office Mr. Lopez explained bankruptcy law and procedure to him.[1]

It is clear that Mr. Castillo immediately declined to represent Mr. Estrada and asked Mr. Lopez to suggest someone else. Mr. Lopez contacted Mr. Fahey who was willing to undertake the engagement for $15,000. No agreement was made at that time.

It is not clear what happened immediately after that March meeting. In the period between March and June, Mr. Fahey asked Mr. Lopez what had happened to the "ambulance case" that Mr. Lopez was going to refer. Mr. Lopez responded that Mr. Estrada was unable to pay $15,000, but was able to pay $10,000.

Mr. Fahey then agreed to accept $10,000. About June 4, Debtor wrote a check for $10,000, and Mr. Estrada delivered the check (with the payee line left blank) to Mr. Lopez. As discussed below in more detail, at that time Mr. Estrada also personally gave Mr. Lopez a Rolex watch.

3. June 4, 2009, until November 4, 2009

Mr. Estrada testified that although his objective was to get someone to represent Debtor in the dispute with the IRS, Mr. Lopez advised him that he needed to file a bankruptcy case and to devise an IRS payment plan.[2] Mr. Estrada further testified that Mr. Lopez told him that once the bankruptcy petition was filed, he must stop making all payments to creditors.[3] That discussion was in early June, 2009 when the $10,000 retainer was paid.

It is not clear what the parties determined to be the scope of the legal engagement. Mr. Estrada was looking for someone to solve his IRS problems. Mr. Lopez was suggesting a bankruptcy filing to accomplish that objective. But no bankruptcy petition was filed. Mr. Fahey and Mr. Lopez testified that between June 4 and November 4 they filed a power of attorney with the IRS and reviewed documents. But Mr. Estrada testified that he had quit paying creditors, expecting an imminent bankruptcy filing.

There is no written engagement agreement. The testimony is conflicting. The Court concludes that the client's legal options were not clearly explained and the scope and objective of the engagement were not clearly defined. Alternatively, Mr. Fahey and Mr. Lopez simply did not do what the client expected them to do.

A preponderance of the evidence establishes that Mr. Estrada was justified in his expectation that Mr. Lopez would be filing a bankruptcy petition promptly after the June 4 payment. Mr. Estrada testified that he quit making payments to creditors based on Mr. Lopez's advice to do so in preparation for the bankruptcy filing.[4] But when Mr. Estrada quit making

---

[1] Transcript of hearing February 24, 2010, (hereafter "Transcript") page 18, line 18 through page 19, line 20.

[2] Transcript, page 18, line 21 to page 19, line 2.

[3] *Id.*

[4] Mr. Lopez testified that Mr. Estrada lied in his sworn testimony, transcript page 81, line 15 through page 82, line 5.

payments, Debtor lost its insurance coverage and creditors began demanding payments. Mr. Estrada testified that he unsuccessfully tried to contact Mr. Lopez from June through November. Mr. Estrada testified that he tried to call Mr. Lopez, he "sent people to look for him," he tried to get in contact with him, but Mr. Lopez was "nowhere to be found."[5] In November a creditor repossessed a van, which precipitated the filing of this bankruptcy case.

Mr. Lopez's discussions with Mr. Estrada related to bankruptcy; but Mr. Lopez's testimony is that the work he performed related to the IRS claim. Mr. Lopez and Mr. Fahey testified that Mr. Estrada signed an IRS power of attorney, that Mr. Lopez reviewed substantial books and records, and that there were unsuccessful negotiations with the IRS.[6] But if this activity took place, there is no evidence that any lawyer was involved with the client. Mr. Castillo had declined the engagement prior to June 4. Mr. Fahey did not meet Mr. Estrada until at least October (but probably not until after the bankruptcy petition was filed in November). Mr. Fahey testified that he filed a power of attorney with the IRS and looked at IRS documents but did nothing else.[7] The Court can only conclude that, to the extent there was anyone representing Debtor before the IRS, it must have been Mr. Lopez under the pretense of working under Mr. Fahey's supervision.

With the possible exception of an insignificant meeting about October 4, 2009 (described below in more detail) neither Mr. Lopez nor Mr. Fahey communicated with Mr. Estrada from June 4, 2009 until about November 4, 2009.

Mr. Lopez testified that both he and Mr. Fahey did substantial work before November in preparation for filing the bankruptcy petition. However, other than their testimony, there is no evidence that they did. They did not keep Mr. Estrada informed of the work that they were doing. Mr. Fahey testified that he did not keep time records of his pre-petition work. Mr. Lopez testified that he does keep time records, but none were introduced into evidence at the hearing.

    4.        The Bankruptcy Filing

In November, 2009 First National Bank repossessed Debtor's van. After a strident telephone call from Mr. Estrada (described in more detail below) Mr. Lopez prepared and filed Debtor's bankruptcy petition.

The Federal Rules of Bankruptcy Procedure ("FRBP") require Mr. Estrada to sign the bankruptcy petition.[8] The document filed in this case purports to have been signed by Mr. Estrada. In this day of digital filing, the uniform procedures of the federal courts require Debtor's attorney to obtain the signatures on an original document and to keep the original in counsel's files.[9] In a previous hearing, the Court found that Mr. Fahey ignored that requirement

---

[5] Transcript, page 22, lines 6 through 17.
[6] Transcript, page 79, line 6 through page 80, line 21.
[7] Transcript, page 129, lines 9 through 25.
[8] FED. R. BANKR. P. 1008 and 9011. *See also* COLLIER'S ON BANKRUPTCY, ¶ 1008.02
[9] *See* ADMIN. P. ECF FOR BANKR. S.D. TEX, Rule III(B)(4).
*http://www.txs.uscourts.gov/attorneys/cmecf/bankruptcy/adminproc.pdf*. This rule is incorporated into the local rules by BANKR. L.R. 1001-1(b).

in at least some consumer cases.[10] Mr. Estrada testified that in this case he had not seen the bankruptcy petition before it was filed and that he had not signed it.[11] Mr. Lopez testified that he did not obtain Mr. Estrada's signature. Mr. Fahey testified that he was reasonably confident that he had obtained Mr. Estrada's signature before the petition was filed on November 4.[12] Mr. Fahey's testimony, however, is inconsistent with his testimony that he did not meet with Mr. Estrada between October 4 and mid-November. The preponderance of the evidence is that Mr. Fahey did not obtain Mr. Estrada's signature on the bankruptcy petition.

The Bankruptcy Code and rules require Debtors to file schedules and a statement of financial affairs with the bankruptcy petition or within 15 days after the petition is filed. Those documents were not filed with the petition. Debtors are required to sign schedules and statements of financial affairs under penalty of perjury. Mr. Estrada testified that Mr. Lopez interviewed him and entered information into a computer, presumably related to the bankruptcy schedules and statement of financial affairs. But Mr. Estrada testified that Mr. Lopez never printed out the information for him to review and that Mr. Estrada had never seen the bankruptcy schedules or statement of financial affairs that were filed into this case. Mr. Estrada also testified that he had never signed them.[13]

Both Mr. Lopez and Mr. Fahey testified that Mr. Lopez prepared the bankruptcy schedules and statement of financial affairs, without Mr. Fahey's help.[14] They both testified that Mr. Fahey reviewed Mr. Lopez's work before the schedules and statement of financial affairs were filed and that Mr. Fahey authorized Mr. Lopez to file the schedules and statement of financial affairs. Mr. Lopez testified that he and Mr. Fahey went to Mr. Estrada's office and that Mr. Estrada signed the bankruptcy schedules and statement of financial affairs.[15]

Mr. Estrada testified that neither Mr. Fahey nor Mr. Lopez ever advised him to file post-petition tax returns timely.[16] Mr. Fahey testified, to the contrary, that a week or more after filing of the bankruptcy case he instructed Mr. Estrada about the need to file IRS form 941. Mr. Fahey did not follow up to determine whether the returns had been filed and whether the taxes had been paid.[17] Mr. Estrada testified that Mr. Lopez told him not to use cash collateral or to pay any bills, including employees. Mr. Estrada said that he protested that it was urgent to pay employees, but that Mr. Lopez told him not to.[18] There was no explanation of how Mr. Fahey and Mr. Lopez expected Mr. Estrada to pay taxes or to operate a business without using cash collateral to pay employees or to pay other bills.

---

[10] Miscellaneous Proceeding No. 09-0501, docket # 16.
[11] Transcript page 51, line 21 through page 52, line 8.
[12] Transcript page 134, line 19 through page 135, line 9.
[13] Transcript page 52, line 9 through page 53, line 24.
[14] Transcript page 82, line 7 through page 83, line 19.
[15] Transcript page 84, line 6-15.
[16] It is important for debtors to file employment tax returns so that funds withheld from employees paychecks are paid over to the United States. The funds are trust funds.
[17] Transcript page 136, line 4 through page 137, line 4.
[18] Transcript, page 34, lines 1-6.

5.      Appointment of a Trustee and Conversion to Chapter 7

On January 16, 2010 the US Trustee conducted the § 341 meeting of creditors and issued a notice to the Debtor of outstanding compliance matters.  This list included:

   a.   Failure to disclose the assumed name "A Ambulance Service" in the petition;

   b.   Failure to disclose an alleged executory contract with Doctors' Hospital of Laredo and Eagle Pass Nursing and the lease with Ace Auto Service;

   c.   Failure to discloses all co-obligors and guarantors in connection with its debts, including Mr. Javier Estrada as guarantor of the debt owed to First National Bank;

   d.   Failure to disclose in the statement of financial affairs all financial statements issued within two (2) years of bankruptcy and all current officers, directors and shareholders in item 21;

   e.   Failure to transmit to the UST a certificate that Debtor's corporate charter has not been forfeited and is in good standing; Failure to transmit to the UST evidence of the closing of the pre-petition bank accounts;

   f.   Failure to transmit to the UST evidence, in the form of a certificate of insurance, of commercial general liability insurance, commercial property damage insurance, vehicle liability insurance, ambulance professional liability insurance, and workers' compensation insurance, or some alternative employee accident insurance;

   g.   Failure to ensure that the UST is a party to be notified in the event of cancellation or nonrenewal of any of the insurance policies;

   h.   Failure to prepare and file an application to retain an accountant, if necessary;

   i.   Failure to obtain lienholder consent or court approval for use of cash collateral;

   j.   Failure to comply with § 1116(a) in this small business case;

   k.   Failure to transmit to the UST a copy of any balance sheets, income statements, cash-flow statements, or statements of operations in 2009;

   l.   Failure to  transmit to the UST a copy of any financial statements issued within two (2) years of bankruptcy;

   m.   Failure to transmit to the UST a 90-day projection of cash receipts and disbursements.

The letter also informed Debtor of the requirement to file monthly operating reports and the requirement to attach a copy of the relevant monthly bank statements. Finally, the letter reminded debtor of the requirements of Bankruptcy Code § 346 to make tax deposits as required by state and federal law.

These are requirements that chapter 11 debtors must meet in every chapter 11 case, and that are also the subject of Bankruptcy Local Rule 4002-1(a).[19] Debtors usually satisfy the requirements when (or within a few days after) they file the chapter 11 petition. As set forth in more detail below, there is no indication in the record that Mr. Fahey or Mr. Lopez timely advised Debtor of these requirements or that Debtor ever complied with these routine requirements.

On January 19, the US Trustee filed an emergency motion to dismiss the case or to appoint a trustee because of Debtor's failure to comply with these standard requirements. The US Trustee also filed a motion to examine the payments received by Debtor's counsel, Mr. Fahey.

On January 25, Debtor, counsel for the Debtor, and the US Trustee filed a stipulated order for appointment of a trustee and for withdrawal of Mr. Fahey's application to be employed as Debtor's counsel for post-petition work.[20] Mr. Estrada testified that he did not know that Mr. Fahey had withdrawn his application to represent Debtor.

On February 5, 2010, the recently-appointed chapter 11 Trustee filed an emergency motion to convert the case to chapter 7. At the hearing the Trustee presented evidence that the estate did not have (and could not obtain) insurance coverage to operate the ambulance business, that the trustee could not reach an agreement with secured creditors for use of cash collateral, that tax deposits had not been made post-petition and that substantial post-petition taxes were due, that Debtor did not have enough money to pay the post-petition employment taxes, that Debtor had not made payments of US Trustee fees as required by statute, and that the chapter 11 trustee did not have sufficient funds to make payroll or other costs of operations.[21] The evidence further supported the Trustee's assertion that Debtor did not have profitable operations and should be liquidated.

After hearing on February 11, the Court concluded that the Trustee had sustained the burden of proof and converted the case to chapter 7.[22] That order is on appeal.

B.   Analysis of the Evidence and Issues By Topic

   1.   $10,000 and a Rolex Watch

Mr. Fahey testified that about March, 2009, Mr. Lopez offered to "refer" Debtor's bankruptcy case to Mr. Fahey and Mr. Fahey quoted a fee of $15,000, which Mr. Lopez

---

[19] *Infra*
[20] Docket # 37
[21] Docket # 47
[22] Docket # 59

communicated to Mr. Estrada. Mr. Estrada told Mr. Lopez that he did not have that much money, and offered $10,000. Mr. Fahey testified that he agreed to a $10,000 flat fee.[23] Mr. Lopez communicated that information to Mr. Estrada and Mr. Lopez accepted a check from Mr. Estrada in that amount. Mr. Estrada testified that Mr. Lopez told him to leave the name of the payee blank, and said that the name of the attorney would be filled in later. Prior to June, 2009 Mr. Estrada had never met Mr. Fahey and there is no evidence that he even knew Mr. Fahey's name when he wrote the check. No one at the trial knew who filled in the name of the payee or when that name was filled in.

Mr. Estrada testified that Mr. Lopez led him to believe that the total fee was $15,000, and that the $10,000 was a partial payment. Mr. Estrada stated that Mr. Lopez demanded security for the additional $5,000. Mr. Estrada testified that he gave Mr. Lopez a Rolex watch as collateral for payment of the remainder of the fee, that Mr. Lopez promptly had the watch appraised, and that Mr. Lopez demanded substitute collateral because the watch had appraised for substantially less than $5,000. Mr. Estrada testified that he gave Mr. Lopez a substitute Rolex watch that was worth $11,000.

Mr. Lopez denies that the Rolex watch was taken as collateral. He testified that Mr. Estrada offered to "give" him the Rolex if Mr. Lopez could find an attorney to take the case for $10,000. Mr. Lopez testified that it was not until _after_ Mr. Fahey had agreed to represent Debtor for a $10,000 fee that Mr. Estrada offered to "give" him the watch as a "friend." Mr. Lopez testified that he did not expect to collect the additional $5,000.

Mr. Lopez's testimony is simply not credible in view of Mr. Lopez's admission that he had the watch appraised and demanded a more valuable watch because the first watch appraised too low.[24] There seem to be only two possibilities. Either Mr. Lopez took a valuable Rolex watch as a fee for referring Debtor to Mr. Fahey for legal representation, or Mr. Lopez took a Rolex watch as collateral for a debt that was not owed. Either scenario is problematic.

In any event, it is undisputed that Mr. Estrada made no further payments pre-bankruptcy and that Mr. Lopez kept the watch for about 6 months, until about 2 months after the bankruptcy petition was filed. Mr. Lopez returned the watch to Mr. Estrada only after Mr. Fahey threatened to refer Mr. Lopez to the Webb County District Attorney if Mr. Lopez did not return it. Mr. Lopez testified that he returned the watch because it was the right thing to do.

On or prior to June 4, Mr. Fahey's name was filled in as payee of the $10,000 check, and Mr. Fahey cashed the check.[25] Mr. Estrada testified that he learned a few weeks later that Mr. Lopez was not an attorney and that Mr. Fahey would be his attorney. Mr. Fahey paid Mr. Lopez "about" $2,500 and $3,000.[26] Mr. Fahey testified that the sum was an estimate of how much

---

[23] Mr. Fahey filed into the bankruptcy record the disclosure of compensation required by Rule 2016 of the Federal Rules of Bankruptcy Procedure. That disclosure states that Mr. Fahey received $10,000 and that he would bill on an hourly basis. Mr. Fahey testified that his statement in the record is simply wrong, that his agreement was a flat fee of $10,000. Mr. Fahey has no written fee agreement regarding this $10,000.

[24] Transcript, page 72, line 20 through page 75, line 22.

[25] Mr. Fahey testified that he does not believe in bank accounts and does not have an IOLTA account.

[26] Mr. Lopez thought it was $3,000. Mr. Fahey thought it was about $2,500. The payment was made in cash.

time Mr. Lopez would devote to the case, but he testified that the parties understood that if reality did not match expectations there would be an adjustment of some sort. There was no agreement on how that adjustment would be made, or even on Mr. Lopez's hourly rate. Mr. Lopez testified that he charges $70 per hour while Mr. Fahey testified that he pays Mr. Lopez $65 per hour.

Mr. Fahey testified that $10,000 was a flat fee and that he does not keep time records for pre-bankruptcy flat fee work. Therefore, he has no contemporaneous time records of work performed prior to November 4, 2009.[27] Mr. Fahey asserts that he earned all of the flat fee, or in the alternative that he earned a substantial part of the flat fee.

      2.     Evaluation of Services Performed Pre-Bankruptcy

Mr. Lopez testified that he participated in Debtor's representation only under the supervision of either Mr. Castillo or Mr. Fahey. That testimony was not credible. First, the testimony was scripted and rehearsed; it seemed to be merely to be a recitation of the rules under which paralegals can work rather than a description of what actually happened.

With respect to working under Mr. Castillo's supervision, the evidence indicates that Mr. Castillo brought Mr. Lopez into the discussion to provide bankruptcy expertise, not to work under Mr. Castillo's supervision. Mr. Lopez testified that Mr. Castillo is not a bankruptcy attorney.[28] Mr. Fahey testified that Mr. Castillo " … doesn't do bankruptcies."[29] Mr. Lopez testified that his involvement in the Castillo discussions with Mr. Estrada was to bring his "knowledge" to bear -- in context implying that Mr. Lopez brought bankruptcy "knowledge" to the table (knowledge that Mr. Castillo did not have).[30] Mr. Lopez testified that Mr. Castillo decided not to take the engagement. The Court concludes that Mr. Lopez knowingly gave legal advice without the supervision of an attorney during the period prior to June 4.

With respect to working under Mr. Fahey's supervision, Mr. Fahey testified that he believes that he first met Mr. Estrada during a superficial visit to Debtor's premises in early October, 2009. Mr. Fahey concedes that he did not interview Mr. Estrada in any detail until mid-November, 2009, weeks after the bankruptcy petition was filed.[31] Any legal analysis and advice about bankruptcy from June, 2009, until November, 2009 must have come from Mr. Lopez, without any meaningful supervision.

---

[27] The FRBP 2016 fee disclosure filed into this case by Mr. Fahey suggests that he anticipated payment on an hourly basis. Mr. Fahey states that the Rule 2016 statement is simply incorrect. Later in this case, when the US Trustee objected to application to engage Mr. Fahey as Debtor's post-bankruptcy counsel, as described more fully below Mr. Fahey agreed to withdraw the application and to waive any post-petition payment. Mr. Fahey testified that he kept time records after the date of the bankruptcy filing but he offered none at the hearing of this matter.

[28] Mr. Lopez so testified at transcript, page 102 lines 13-14.

[29] Transcript, page 125, lines 12-21.

[30] Transcript, page 110, lines 13-21.

[31] Mr. Fahey testified that he went to Debtor's offices to review records about October 4. He further testified that he understood that Mr. Estrada did not think that the two of them met until after the bankruptcy petition was filed November 4. Mr. Fahey was not sure whether he or Mr. Estrada was incorrect. In any event, the October 4 meeting was four months after Mr. Fahey accepted Debtor's check and the legal engagement. The October 4 visit was also apparently very superficial; if it occurred, because Mr. Fahey testified that he did not interview Mr. Estrada or creditors prior to filing the bankruptcy case. Transcript page 127 line 8 through page 128 line 10.

Mr. Estrada testified that he quit paying creditors about July, 2009, after being advised by Mr. Lopez that he should do so in preparation for the bankruptcy filing. He testified that he then tried frequently to contact Mr. Lopez, but was unable to reach Mr. Lopez on the telephone and was unable to get Mr. Lopez to return his calls when he left voicemail messages. Mr. Estrada testified that he was unable to contact Mr. Lopez in July, August, September, and October. He was not able to contact Mr. Lopez until shortly before the bankruptcy petition was filed in November. Mr. Estrada testified that he wanted to talk with Mr. Lopez about paying creditors during that time, especially employees, because creditors were pressing him for payment. He testified that because he was unable to reach Mr. Lopez, he simply did what he thought necessary to keep the business going. Mr. Estrada did not testify that he tried to contact his attorney, Mr. Fahey, and did not explain why not.

Because Mr. Estrada quit making payments to the insurance company, his insurance was canceled. Because Mr. Estrada quit making payments to First National Bank, the bank repossessed Debtor's van which precipitated the filing of the bankruptcy case.[32] If even a small part of Debtor's evidence in opposition to conversion of the case to chapter 7 is correct, or if Debtor's allegations on appeal of that order bear even a vestige of truth, the advice that Mr. Lopez gave Mr. Estrada was fatal to the business.

Mr. Estrada testified that he did not receive a return call from Mr. Lopez until he left a voicemail message for Mr. Lopez about the repossession of the van. Mr. Estrada testified that he said in the message that he was "going to get back at [Mr. Lopez] for not doing anything."[33] The bankruptcy case was filed that day, November 4, 2009.

Mr. Lopez testified that he analyzed Debtor's records from June through November in an attempt to resolve the IRS dispute. He testified that he did not keep Mr. Estrada informed about this work and did not reply to Mr. Estrada's phone calls prior to late September because he was too busy with other cases.[34] Mr. Lopez also testified that he was unable to return Mr. Estrada's calls after late September because he had suffered a minor stroke in late September and was out of commission for two or three months. The testimony about inability to work for an extended period of time is inconsistent with his testimony about the amount of work that he did analyzing Debtor's books and records during this period.

Mr. Lopez gave no reason why Mr. Estrada would be attempting to contact him instead of Mr. Fahey or why Mr. Fahey did not return Mr. Estrada's calls. The fact that Mr. Estrada attempted to contact only Mr. Lopez, and not Mr. Fahey, further undermines the credibility of Mr. Lopez's testimony that he worked only under attorney supervision and that Mr. Estrada knew that.

Mr. Fahey testified that he did not interview Mr. Estrada, at any length, until mid-November 2009, after Mr. Fahey had filed Debtor's bankruptcy petition. Mr. Estrada testified

---

[32] Transcript, page 24, line 20 through page 25, line 12.
[33] Transcript, page 25, lines 10-11.
[34] Transcript page 78, line 12 through page 80, line 12.

that he did not meet Mr. Fahey until mid-November.[35] Mr. Fahey only superficially reviewed Debtor's financial status prior to the November 4 petition date and did no legal research prior to the petition date.[36]

There is no explanation of why Mr. Fahey did not contact Mr. Estrada for a serious discussion with his client between June (when he cashed the check representing his fee) and mid-November after he had filed Debtor's bankruptcy petition.

The only document prepared before the bankruptcy filing was the petition itself. The bankruptcy schedules and statement of financial affairs were prepared after the filing.[37]

3.  Cash Collateral

Bankruptcy Code § 363(c)(2) provides:

> [A debtor-in-possession][38] …may not use … cash collateral … unless—
>
> (A) each entity that has an interest in cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use …

If an agreement for use of cash collateral includes a provision for adequate protection of the secured creditor, Rule 4001(d) of the Federal Rules of Bankruptcy Procedure requires the parties to file a motion to use cash collateral, it requires that the agreement be attached to the motion, and it requires service of that motion on parties in interest. Arguably (under national rules), the agreement need not be in writing if it does not provide the creditor adequate protection.[39] But because disputes about oral agreements are common, the bankruptcy judges of this district have promulgated Bankruptcy Local Rule 4002-1(i) which requires all agreements to use cash collateral to be in writing.

Mr. Fahey testified that he did not contact the secured creditors prior to the filing of the bankruptcy case. He testified that he told Mr. Lopez to discuss the use of cash collateral with the secured creditors. Mr. Fahey testified that he told Mr. Lopez either to get an agreement or to file a motion to use cash collateral. Mr. Fahey testified that he was copied on the emails between Mr. Lopez and the secured lenders and that he believed that Mr. Lopez had obtained an agreement to use cash collateral.

---

[35] *See also* Transcript, page 28, lines 1-9.
[36] Transcript page 130, line 1 through page 132, line 12.
[37] *See* docket # 9.
[38] The bracketed language is substituted for clarity. Section 363(c)(2) actually prohibits use of cash collateral by a trustee. At the commencement of this case, the Debtor was a debtor-in-possession (Bankruptcy Code § 1101(1)). A debtor-in-possession has the rights, powers, and duties of a trustee and is subject to the limitations imposed by law on a trustee, Bankruptcy Code § 1107(a).
[39] Although, the undersigned bankruptcy judge does not remember every having seen an agreement for use of cash collateral over the past 26 years that does not provide for the statutorily required "adequate protection."

The US Trustee requested from Mr. Fahey any documentation reflecting a cash collateral agreement or order.  Mr. Fahey's response to the US Trustee was introduced into evidence as US Trustee Exhibits 14 and 15.

Exhibit 14 consists of copies of emails between Mr. Lopez and Mr. Villarreal (representing First National Bank).  The email thread begins on November 18, 2009 with a summary of a telephone discussion between Mr. Villarreal and Mr. Lopez for the use of cash collateral, including provision for adequate protection.  Mr. Lopez states that "… our (sic) office will draft a 4001 Motion and 4001 Order for submission to the Bankruptcy Court shortly."  Mr. Villarreal's response states that the agreement is contingent on approval by the court.  The next email is dated three weeks later.  It purports to attach a draft motion and order that would represent an agreement among Debtor, First National Bank, and the IRS to the use of cash collateral.  The motion and agreement reference a budget for operation of the business.  That budget is not attached.

Exhibit 15 consists of copies of emails between Mr. Lopez and Assistant US Attorney Hector Ramirez, representing the IRS (which had filed a lien against Debtor's property).  The first email from Mr. Ramirez to Mr. Fahey, is dated December 1, 2009, and reads:

> Ed, we need to discuss the use of cash collateral by the debtor in this case.  The IRS sent you a letter dated November 5, 2009, denying the use of cash collateral unless adequate protection was provided.  Your paralegal, Pedro Lopez, requested a one-time use of cash collateral on November 13, so that payroll could be made.  The IRS agreed to the use of the cash collateral for that limited purpose with the understanding that the debtor would make no further use of cash collateral until the debtor had filed a motion to use cash collateral with the Court.  Mr. Lopez assured the IRS that such a motion would soon be filed with the Court, but as of today, no such motion has been filed.  Please contact me to resolve this matter.

U.S. Trustee's Exhibit 15.

Mr. Lopez responded to Mr. Ramirez.  That response included a draft motion and agreement.  The IRS responded with comments and demands for revision of the documents.  Mr. Lopez responded by agreeing to the demands of the IRS, agreeing specifically that Debtor would comply with the IRS requirements; Mr. Lopez also agreed to revise the motion.  The next email is dated 5 weeks later, from Mr. Ramirez asking about the status of the revision.  The final email was dated a week later, from Mr. Lopez to Mr. Fahey transmitting Mr. Ramirez's inquiry.

No agreement was ever signed by a creditor.  No motion was ever filed with the Court.  Mr. Fahey testified that the cash collateral order was never filed because Mr. Lopez and Mr. Fahey "dropped the ball."[40]

---

[40] Transcript page 144, line 23 through page 145 line 4.  *See also* page 151 lines 11-19.

The Court concludes that Debtor never reached an agreement for use of cash collateral and that Debtor used cash collateral in violation of the statutory prohibition, the Federal Rules of Bankruptcy Procedure, and Bankruptcy Local Rules.

Mr. Lopez's and Mr. Fahey's defalcations regarding cash collateral were equally fatal to the business.

4.      Instructing Debtor About Debtor's Duties

Bankruptcy Code § 1101(1) provides that a debtor in a chapter 11 case is a debtor in possession (DIP). Bankruptcy Code § 1107(a) gives a DIP the powers, duties, and responsibilities of a trustee. The DIP that operates a business has important responsibilities. To emphasize those, BLR 4002-1 provides:

> **Local Rule 4002-1. Duties of Debtor-in-possession.**
>
> (a) A debtor in possession is responsible for strict compliance with the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and standing orders. Counsel for the debtor-in-possession is responsible for instructing the debtor about the U. S. trustee guidelines for a debtor-in-possession and insuring compliance with those guidelines.
>
> (b) The debtor, its officers, and agents hold and manage the debtor's assets as fiduciaries for the estate; they must strictly comply with court orders and Bankruptcy Code §§ 363 and 1107. The debtor must prevent the depletion of the assets of the business during the proceedings, and it must notify its counsel immediately of a depletion or potential depletion.
> …
> (d) The debtor may not use property of the estate to pay any prepetition unsecured obligation except on order.
> …
> (g) The debtor must comply fully with Title 11's tax provisions, with the deposit requirements of the Internal Revenue Code and Regulations, and with all state tax laws.
>
> (h) The debtor must pay on a current basis all obligations incurred by it in operating its business.
>
> (i) The debtor must not use cash collateral without prior **written** consent of the secured creditor or an order.
>
> (j) This list of duties is not exclusive, and it does not exclude unenumerated obligations imposed by law. Counsel for the debtor-in-possession is responsible to instruct the debtor of this rule immediately on filing the case.
>
> (k) Counsel may advise the court of any knowing violation by debtor.

[Emphasis supplied.]

Mr. Fahey testified that he did not instruct Mr. Estrada or the Debtor regarding its duties as a DIP/trustee prior to the filing of the petition. Mr. Fahey testified that he instructed Mr. Lopez to instruct the Debtor about those duties and responsibilities. But Mr. Fahey testified that he had conversations with Mr. Estrada a couple of weeks into the case about a debtor's duties and responsibilities.

The US Trustee requires chapter 11 bankruptcy debtors to file monthly reports of operations so that the US Trustee can monitor the case to determine whether the debtor is fulfilling its responsibilities under the Bankruptcy Code and FRBP. The reports must be in appropriate format to provide clarity and uniform analysis. The US Trustee provides forms for that purpose. Debtor did not file the monthly reports. Mr. Fahey asserts that he prepared a financial analysis that he filed into the record at a hearing. The Court is familiar with the document to which Mr. Fahey alludes. The document is inadequate. It is not in the required format and does not provide comprehensive information. The document is not in any format recognized by established accounting principles. It is an unsubstantiated advocacy document, not financial reporting.

While failure to file operating reports was not, by itself, fatal to the business, it was a serious harm.

     5.     Withdrawal From Client Engagement and Representation of Debtor Without Authority

Two weeks after the bankruptcy case was filed, on November 19, 2009, Debtor filed an application to employ Mr. Fahey as its bankruptcy counsel. On January 21, the US Trustee filed an objection to the application and a motion to examine Mr. Fahey's compensation.

On January 25, 2009, Mr. Fahey entered a stipulation with the US Trustee in which Debtor withdrew the application to engage Mr. Fahey. Both Mr. Estrada and Mr. Fahey testified that Mr. Fahey did not discuss withdrawal with Mr. Estrada prior to filing the stipulation.[41]

## II.    CONCLUSIONS

A.    Court's Inherent Authority

The Court has always had inherent power to regulate the practice of counsel appearing before the Court. *Chambers v. NACO, Inc.*, 501 U.S. 32, 111 S. Ct. 2123 (1991), *In re Johnson,* 921 F.2d 585 (5th Cir.1991), *Price v. Lehtinen*, 564 F.3d 1052, (C.A. 9, 2009), *In re Placid Oil Co.,* 158 B.R. 404, 411 (N.D.Tex.1993), *In re Irons*, 379 BR 680 (Bankr., S.D. TX, 2007)

---

[41] Transcript page 138, line 19 through page 139 line 4.

B.  Court's Specific Authority Regarding Counsel Fees

1.  Bankruptcy Code

Bankruptcy Code § 105(a) authorizes a bankruptcy judge to issue any order that is necessary or appropriate to carry out the provisions of Title 11.

11 U.S.C. § 329 requires disclosure of payments to attorneys made within one year prior to the filing of a bankruptcy case.  *See also* FRBP 2014 and 2016.  11 U.S.C. § 329(a) applies to an attorney "whether or not such attorney applies for compensation under this title…" and applies regardless of whether the payment to counsel was pre-bankruptcy for pre-bankruptcy work, post-bankruptcy for post-bankruptcy work, or otherwise.  The disclosure is required so long as the payment is made "in connection with" the bankruptcy case.

11 U.S.C. § 329(b) provides:

> If such compensation exceeds the reasonable value of such services, the court may … order the return of such payment, to the extent excessive…

Section 329(b)(1) and (2) authorize the bankruptcy court to require that the payment be returned to the estate if the property transferred would have been property of the estate.  Or, the bankruptcy court can order disgorgement of the payment to "entity that made the payment".

2.  The Court Concludes that Disgorgement of the $10,000 Fee is Authorized by § 329

The $10,000 payment to Mr. Fahey was made by Javier Estrada, Inc. (which became the bankruptcy Debtor).  The payment was made within one year prior to the filing of the bankruptcy petition and was made for legal services "in connection with" this bankruptcy case.

3.  Section 329 Authority to Disgorge is Not Limited To Payments From Property of the Estate

Mr. Fahey argues that the Court cannot order disgorgement of pre-petition payments to an attorney if the attorney charged a "flat fee" because the payment was not a retainer and is not property of the estate.  That argument is not persuasive for two reasons.

First, Mr. Fahey's FRBP 2016 disclosure states that his fee is on an hourly basis.  Mr. Fahey did not take the position that the entire $10,000 was earned pre-petition until this proceeding to require disgorgement.

Second, even if the fee were not property of the estate at the time that the bankruptcy petition was filed, the Court could nevertheless order disgorgement under § 329 if the fee exceeded the reasonable value of the services rendered.  *COLLIER ON BANKRUPTCY, 15th Ed. Rev.* explains the issue this way:

> [d] Retainer as Property of the Estate
>
> Whether the retainer is property of the estate under section 541 of the Code may be determinative of whether the retainer fee will be reviewed under section 329 or section 330:
>
> Under § 329, attorney fees are scrutinized on the basis of their reasonableness. ...
>
> Under § 330, attorney fees are awarded only to the extent that the services are reasonable, actual, necessary and beneficial to the estate. Thus, § 330 applies a more stringent standard than § 329. ...
>
> <u>Section 329 applies to review of a retainer if the retainer is not property of the estate…</u>

COLLIER ON BANKRUPTCY, 15th Ed. ¶ 329.04. *See also In re Hargis*, 895 F.2d 1025 (5th Cir. 1990) specifically remanding for a determination of the amount of fees paid from non estate assets and authorizing the bankruptcy court to order disgorgement under § 329 to the extent that the fees were not reasonable.

    4.    Disgorgement to the Estate Is Appropriate

Section 329 provides that the court may order disgorgement to the party that paid the funds (in this case Javier Estrada, Inc., the Debtor), or to the bankruptcy estate if the payment would have been property of the estate. The Court concludes that disgorgement to the estate is authorized and appropriate. If the funds had not been paid to Mr. Fahey, they would have become property of the estate (i.e. they would have been retained by Debtor and become property of the estate). The test is not whether the funds were property of the estate, but whether the payment "would have been" property of the estate.

Therefore, to the extent that the Court determines that the payment exceeds the reasonable value of the legal services rendered by Mr. Fahey, the Court may order Mr. Fahey to return the money to the estate.

C.    The Payment to Mr. Fahey Exceeds the Reasonable Value of the Services Rendered

The Court concludes that a payment of any sum of money to Mr. Fahey for the services he rendered in this case would be excessive.

    1.    Pre-Petition Work

The legal services provided prior to the filing of the bankruptcy case were incompetently performed and detrimental to the client. Those services had no value:

        a.    Counsel failed to meet with his client prior to taking the engagement or within a reasonable time thereafter; there was no meaningful meeting

      between Counsel and his client until approximately 5 months after he accepted the retainer, a date that was subsequent to the filing of the bankruptcy petition;

  b. Counsel did not ever effectively communicate to the client an analysis of his legal situation, did not effectively explain the client's options, and did not define the scope or objectives of the engagement;

  c. Counsel did not communicate with the client from June through at least October, during a time that the client was urgently trying to reach him for time-critical advice about running a business;

  d. Counsel did not present any evidence that he took any meaningful measures to collect a $365,000 NSF check that he alleges was a principal cause of the client's financial distress;

  e. Counsel allowed a paralegal to have unfettered access to the client and to provide legal advice that was incorrect and eventually fatal to the business;

  f. Counsel failed to advise his client of the requirements and responsibilities of a chapter 11 debtor in possession prior to filing a chapter 11 case;

  g. Counsel filed a bankruptcy petition without first obtaining his client's requisite signature;

The Court recognizes that Counsel states that he reviewed documents and filed a power of attorney with the IRS prior to filing the bankruptcy petition. There is no indication, however, of how much effort was put into this work and the alleged effort appears to have borne no positive results. With no evidence of the scope of the work and no indication that the work had any positive effect, the Court assigns that the alleged work had no value.

  2. Post-Petition Legal Services

The Court recognizes that Mr. Fahey has waived legal fees from the estate for post-petition work. However, the Court has considered the reasonable value of that work to determine whether somehow work performed post-petition ameliorates or mitigates the pre-petition defalcations. The Court concludes that the work done post-petition was incompetently performed and had no value:

  a. Counsel assigned to a paralegal the critical duty of negotiating with secured lenders for permission to use cash collateral;

  b. Counsel and the paralegal "dropped the ball" and failed to obtain use of cash collateral, resulting in Debtor's inability to continue operations in a legal, businesslike way, ultimately resulting in the demise of the business;

    c.    Counsel failed to take even reasonable measures to monitor whether the client was using cash collateral illegally, paying post-petition trust fund taxes, and complying with elementary and routine accounting, reporting, and other compliance measures; the client appeared to be ignorant of those requirements which appears to have resulted in conversion of the case to chapter 7 and the business's demise;

    d.    Counsel allowed his paralegal to be the sole person to interview the client for preparation of the bankruptcy petition, schedules, and statement of financial affairs; the client testified that he never saw a printed copy of the final documents and never signed them; the documents were filed with the Court on the representation that client had signed them, although the paralegal definitively states that he did not obtain the signature; Counsel never interviewed the Client about these documents before they were prepared and there is no evidence that Counsel reviewed the documents in detail with the client;

    e.    Counsel failed to meet with the client and the newly appointed chapter 11 trustee to effect a transition of control of the business when the client consented to appointment of a chapter 11 trustee. In fact, Counsel withdrew his application to represent Debtor and appears to have withdrawn from the representation, without client or Court approval, until Mr. Estrada paid additional fees.  Counsel now complains that conversion of the case to chapter 7 resulted from the Trustee's failure to understand the business's potential; competent representation would have never allowed that problem to exist because competent counsel would have met with the Trustee and his client and provided whatever information the Trustee needed (if indeed any such positive information existed) to run the business;

    f.    Counsel withdrew from representation of the Debtor post-petition without obtaining client consent and without even informing his client;

    g.    Counsel failed to supervise his paralegal and allowed the paralegal to give incorrect, incompetent legal advice about the consequences of filing the bankruptcy petition;

    h.    Counsel gave the paralegal full authority regarding the client interview and completion of the bankruptcy schedules, and statement of financial affairs, all without adequate review by Counsel or the client and without informed consent by the client;

    i.    Counsel is simply disingenuous when he represents to the Court that he thought his paralegal had obtained a written agreement with the secured lenders to use cash collateral.  First, he concedes that he and the paralegal "dropped the ball."  Second, no reasonable person could believe that the

documents Counsel supplied constituted a written agreement to use cash collateral.

### III.     ORDER FOR DISGORGEMENT

Because the Court concludes that Counsel's services had no value, the Court will (by separate order issued this date) require disgorgement of the entire $10,000 fee received by Mr. Fahey. The Court will order Mr. Fahey to pay $10,000 to the chapter 7 trustee by March 29, 2010.

SIGNED 03/10/2010.

_Wesley W. Steen_
Wesley W. Steen
United States Bankruptcy Judge